25-8060. Each side has 20 minutes. Good morning, Judge Callahan. Your Honors, may it please the Court, my name is Michael Edney. I represent Rocky Patel Premium Cigars, Inc., the other Premium Cigar Company appellants as well as the trade associations challenging the California statute. I'd like to reserve with the Court's permission four minutes for rebuttal. Thank you. Your Honors, the California Unflavored Tobacco List Law unnecessarily crushes handmade premium cigars. They are made from natural tobacco by artisans and family businesses. Under federal law, they cannot be flavored, but because of their small volume varieties, they constitute by far the largest volume of applications that have to go through the California premarket review process. So is it the cost that is crushing? It is, Your Honor. So that's what the litigation is all about? In many ways it is. There's a significant fee per application, so there's tens of thousands of these premium cigar varieties. Many of them have had to be pulled from the market as a result. There's also the cost of assembling the application. You mean the tobacco that's used? That's right. I mean unlike cigarettes that kind of roll off the assembly line by the billions for one type, premium cigars come in a lot of different varieties because they come from the best tobacco from any given harvest. So there's tens of thousands of varieties of premium cigars. You need one application for each, you need one fee for each, and each application costs many thousand dollars to put together. So it's that cost that the record shows comes into the tens if not hundreds of millions of dollars for the premium cigar industry. In fact, this law wasn't really meant to go after cigars, much less premium cigars. The problem that was trying to be addressed was the problem of youth use of flavored vapes. But the record also shows that even the state projected that of the 9,000 applications they expected to get, 7,500 of them or so would come from premium cigars. I think that number is going to prove to be much larger. So if you want to say that it's preempted, looking at the text of the Savings Clause, what is your best argument that the text of the Savings Clause is limited to restriction on point-of-sale regulations? Well, Your Honor, so the Savings Clause exempts requirements related to sales. Sales requirements are like the one that this Court addressed in the 2022 R.J. Reynolds v. County of Los Angeles decision. They identify the physical characteristics of tobacco products and they impose obligations on retailers not to sell them. This law, by contrast, acts directly on manufacturers, placing no fewer than a dozen obligations on them. The manufacturers are the ones that need to apply. This is section B1 of 140459.1 of the California Health and Safety Code. The manufacturers are the ones that have to pay fees. This is subsection K. The manufacturers are the ones that have to submit to California jurisdiction. This is subsections I and J. The manufacturers are the ones that are ordered to answer questions. This is sections B2 and B3. And the manufacturer's speech is the one that attaches presumptions. But there's nothing here that sort of touches on the way in which the premium cigar is put together. Well, no. It asks a bunch of questions about how it is put together. I mean, I guess that's But there's nothing here that says you must include X percent or whatever of a particular tobacco. That's right, Your Honor. Not in the way that the court's, R.J. Reynolds' opinion talked about it. It doesn't micromanage the manufacturing process. But it does go to the manufacturing stage. Or how tightly they're rolled and all that. Exactly, Your Honor. None of that. But it does go to the manufacturing stage because the burdens and the requirements are on the manufacturers. The term manufacturer appears to That sounds like post-manufacturing to me. No, I don't think so. Why not? I mean, what this court said is the federal government's domain is right up until the actual point of sale. And this is acting before that because this is taking participants in the process much earlier, the manufacturers, and placing obligations directly on them. But doesn't any sales prohibition have an impact on the manufacturer? If California bans flavored tobacco, the manufacturer can no longer manufacture flavored tobacco. What's the difference? Well, sure, Your Honor. I mean, and I think that the Second Circuit's decision in the U.S. Smokeless case is very instructive. This is a case that came before this court's R.J. Reynolds case. It was heavily relied upon by the court in this case. And what the U.S. Look, we have a situation here where a restriction on retail sale, a ban on what the retailers may sell, is creating incentives or motivations about what the manufacturers do. Well, if you can't sell something that has this ingredient, well, you probably shouldn't be making things like that or trying to insert them into New York City or into Los Angeles County or into California. It was about that indirect effect. And the U.S. Smokeless Court and this court said there is a point at which that indirect effect could become significant enough to bring it into the manufacturing realm. Here, the legal operation of the scheme is directly upon manufacturers. So it's not an indirect incentive. It's not a motivation. It is a direct requirement for manufacturers. The term manufacturer appears in the Unflavored Tobacco List Law 32 times. In the operative So, I mean, what's the line that you're asking us to draw then? One of the lines I'm asking the court to draw is that under the Savings Clause, perhaps states can place mandates on retailers that might incentivize some manufacturer conduct. But what they cannot do is bring the manufacturer into the state and say, you have to do this, you have to do that, you have to answer our questions, you have to run through a pre-market review application process. That crosses the line into the manufacturing stage. Well, but it seems like premium cigars, by definition, lack a characterizing flavor. Isn't it true, you say this is really burdensome, that certifying that your product is a premium cigar, isn't that sufficient to guarantee placement on the Unflavored Tobacco List, despite the speech presumption? If this is true, how does the UTLS restrict your speech more than necessary to meet the state's interests? Yeah, I mean, jumping to... It seems like you said it was millions and millions of dollars, but I'm sort of looking at it, and it seems like all you have to do is certify in the application that your product is a premium cigar for it to be placed on the Unflavored Tobacco List. How does that law put a negative consequence on you? Yeah, jumping ahead to the First Amendment argument, Your Honor, I mean, I think this would be a different case under the First Amendment and a different case in our state law challenge against the arbitrariness of these regulations if that's all the law did. If the law said, give us a list of your products, tell us that they're a federally regulated premium cigar, and then you're finished, this would be a very different lawsuit. It probably wouldn't be a lawsuit that exists at the moment. But instead, the regulations don't give premium cigar manufacturers that option. They require premium cigar manufacturers, like every other tobacco manufacturer, to submit voluminous applications to the Attorney General that include information about all our labeling materials, our packaging, our marketing materials, a sample of the product in the largest box that is made. So it's turning the Attorney General's office into the world's largest humidor. It's probably a great place to go sample these products if you want. It's an extremely burdensome process. So the process Your Honor describes would have been a more palatable one for us, but it's not the world in which the Attorney General created. But on the speech part, though, I mean, you're not – as soon as you certify that you're a premium cigar, then whatever you say, the speech is totally irrelevant, correct? Well, they say that now. That's not what the regulations of the law say. I mean, I hope that's the way it's going to work out. But the First Amendment has never required the regulated entities to kind of hope that the government will take it easy on them, right? What the First Amendment is concerned about is the terms of the legislation and the possibility that it will chill speech, that you will stop saying things because it will subject you to a bureaucratic penalty lap. And I think that is the concern that's driving the First Amendment analysis. So it's commercial speech, right? It is commercial speech, Your Honor, yes. So the idea that once you certify that you're a premium cigar and so therefore your speech is – so therefore you're unflavored, it's not anywhere in the regulations. Was that just in their litigation? That's just in their litigation. I mean, it was an enormous pivot that they came to in the litigation. I mean, down in the district court, they really tried to say, hey, listen, all these products have to go through. There can't be any exceptions. Your alternative, the premium cigar should be exempted from the presumption of illegality or the process. That's not a viable alternative, right, that we had to consider in the First Amendment analysis. Now they're saying, oh, don't worry about the presumption of illegality because once we see you're a federally regulated premium cigar, you're out of it. Well, then put that into the law, right? Put that into the law. Is there anything else that would give you that status, like an attorney general opinion or something like that? Do they do that to give you that kind of safety net that you're asking? Well, I mean, if that had happened, this might be a different case, but it hasn't happened. I mean, it's just in the Ipsy Dixit litigating papers of the attorney general, and that's not enough to provide First Amendment comfort. As a matter of fact, it makes my case for me, right, because my primary case is that in the district court held that it has to go through central health analysis, my primary case is that the attorney general and the legislature did not consider other alternatives that would restrict less speech or no speech at all. And kind of exempting premium cigars with this box checking exercise from this process would have been an alternative that restricted less speech. They're now conceding it's very viable, it should be in the law, and it demonstrates that the law as written, the regulations as written are unconstitutional. Let me take you back just a little bit. What do you have to do, what do you have to submit to the feds? At this point, so if you were a tobacco product, you have to submit to the feds, to the pre-market review process, essentially exactly what we're submitting to the attorney general. So why is it a burden? I mean, you just take the same application, you got the certification, and you submit it to the feds. Yeah, I mean, I hear what you're saying. I mean, Section 910B1 of the Tobacco Control Act lays this all out. So what they're asking from us is just like the federal pre-market review process. Premium cigars are exempt by federal regulation and court decision from the federal pre-market review process. So we don't have to go through that right now. What we have to tell the feds is we have to demonstrate that we meet the federal definition of a premium cigar, right? And that's in the federal regulations. Their process is much more burdensome for us. How is it much more burdensome? Well, again, this would be a different case if California said, look, just tell us the premium cigars you're making and show how they meet the definition. But instead, in this case, they are asking for the full application that they're asking from any cigarette or any vaping product. So this is a voluminous application, all our packaging materials, all our labeling materials, a series of representations, product samples in our largest box. And this is the record demonstrates it's pretty much undisputed that this is an enormous financial burden for each and every variety that we put forward. And if we just had three or four of them, it wouldn't be that big of a deal, but we have tens of thousands. That's what the big burden is. And that is why this system is preempted, because it is an additional process on top of what the federal government requires through pre-market review. And, I mean, to go back to that question for a moment. I'm sorry. Before you move back, on just the First Amendment question. Sure, Your Honor. If we were to rule that saying, under the regime as represented in the litigation papers, that once you certify that you're a premium cigar, that then any speech is irrelevant, that you're already on the flavored list, would that satisfy you? That if there's any alteration in that rule in application or in the future, then that's all bets are off. Would that be okay with you as far, would that protect your interest, your First Amendment interest? Your Honor, I think the proper way to do this is to strike down their law and regulation as written, because they have... Well, that's your first choice, but he's offering you a second choice. Well, I don't know, what are you saying? Like, if you, I know I'm not here to ask Your Honor questions, but... Under the regime as presented in the litigation papers, that once you certify your federal, that you're a premium cigar, then your speech is irrelevant and you will be on the unflavored list. So it's pretty much automatic. It's automatic, correct. Once you check that box, if you just put in one application and say, you're a premium cigar, here's why, and the application process is over and we don't have to worry about your speech anymore, yes, I think that would probably be constitutional. Okay, thank you. To go back to the preemption case, because I think the preemption case is important. Again, this acts directly on manufacturers. I want to point the Court also to Section 3, Parent 3 of the Act. This is the statement of purpose that Section 387 note. That authorizes the FDA to set national standards controlling the manufacturer of tobacco products and the identity, public disclosure, and amount of ingredients used in such products. This law triggers all of those things for which there's supposed to be national standards where the states aren't supposed to come in. It tries to have the manufacturers disclose ingredients to the states and it tries to place controls directly on the manufacturers. But on top of that, Your Honor. I asked you earlier, how does it place controls in the manufacturing process? The California. Well, it places controls on the manufacturers themselves. Again, the distinction that this Court drew in R.J. Reynolds is we're going to let states act on the point of sale, but we're not going to let them get into the manufacturers. I want to go back through what we went through earlier. So, I mean, you're asking, you know, how is it changing the assembly line? That was a particular issue with tobacco product standards, right? That was the preemption term at issue here. We're dealing with a different preemption term and it's premarket review. And let me just say something about that. The U.S. Smokeless Court, which was widely endorsed by this Court's decision in RJR, said it's not going to be enough to, if you're going to start putting impositions on manufacturers, to just slap on the end of it a condition that says, you know, compliance with this is necessary to be able to sell your products in the state. That's not going to get you out from preemption. Similarly, I think that is a recognition of a key principle. And the key principle is that Congress and the two circuit courts that dealt with these preemption issues care about the mechanism of regulation, right? Not just the objective, right? I mean, they may come here and tell you, look, we're just trying to enforce a flavored product sales ban, but the law cares about how you enforce it. And let me pose a hypothetical. Another term in the preemption clause is against state regulations of labeling, right? So let's just say the state said, we have a flavored product ban and one of the ways we're going to enforce this is we're going to have manufacturers put on their label a disclosure of flavor additives or ingredients. That would be clearly preempted, right? They do that here? They did not do that here. But instead of picking up the term labeling in the preemption clause, they picked up another term, which is premarket review, right? And they said, the way we're going to enforce the flavored tobacco ban is we're going to make the manufacturers come in and make these applications. They're pretty much like the ones that we put in the federal system. And then we're going to make a judgment about each project before it gets on the market. My problem with that argument, though, I think premarket review in that context means the FDA premarket review, right? And they're not making any requirements. I don't think it does. I mean, I hear that argument, Your Honor, but there's at least three reasons why that is not the proper reading of the preemption clause. First of all, the preemption clause talked about requirements in addition to the federal one, right? That's the prepositional phrase that precedes what follows. Second, the district court and the state is hanging a lot of weight on six words under the provisions of this chapter, right? So requirement under the provisions of this chapter relating to premarket review or labeling or registration. They say, aha, it's just the federal process. But imagine a different point, right? The federal process has requirements with respect to the label, what must go on the labeling of tobacco products. If the state said, no, I'm not you have your federal label, that's great. Just somewhere else on the product you need to put our label, our warning. That would be clearly preempted, and the six words under the provisions of this chapter wouldn't save that. What Congress was trying to say is there are certain mechanisms of regulation that are for the feds only. One is to slap warning labels on products, right? That's up to us. The other is to drag the manufacturers in and have them preapply to put their products on the market. I know you're using that all the time. That's up to us. I do, Your Honor, and I'll sit down at this point. Yes, thank you, Your Honor. I'll give you three minutes for rebuttal since we asked you a lot of questions. I'm very grateful for that, Your Honor. Thank you, Your Honor. Good morning. Good morning, Your Honors. Natalie Torres on behalf of the Attorney General of California, Rob Bonta. May it please the Court. The district court properly found that the unflavored tobacco list is not preempted by the Tobacco Control Act and does not violate the First Amendment. I'd like to focus on two general points. First, the UTL is not preempted because the TCA expressly preserves state's authority over tobacco sales. Relevant here is that the UTL creates a complete public list of the unflavored tobacco products that are compliant with the state's tobacco flavor ban. So if we agreed with you that the savings clause allows you to do this, what's the point of making this really onerous here since everyone agrees that Premier cigars are not flavored? So the purpose of the unflavored tobacco list is to have a single public list that lists every individual product that is lawful for sale in California. And California has had a tobacco flavor ban. I mean, I'd like it if no one could ever smoke, trust me, if I were queen of the world, but that's not the case. So here, and I would like to never see another cigar, but that being the case, he basically says they're not flavored, so why do they have to go through the same thing that everyone else does? And he's listed a parade of horribles about how much it costs and that there's a whole lot of different premium cigars. And so at some point, doesn't it become so onerous? Why can't they just automatically show you that they're not flavored and then they go on the list? Well, it's a little bit more than automatic, but it's pretty much a single list of everything that's lawful for sale. I think another way to look at it is if you'd like to sell an unflavored, a lawful, unflavored tobacco product in California, you have to be on the list. And the list is there because we've had a sales ban for several years, and folks got very creative. Instead of clearly labeling the product that it has a flavor or not, now we have this thing called concept flavors. So instead of telling us there's blueberry on a tobacco product, it could be something like... Well, do you doubt that a premier cigar, as defined, if they make it at the federal level, do you have reason to doubt that that would be they could automatically be on your list? At this time, we don't doubt that what plaintiffs are saying, that their products aren't flavored and they meet the federal standard, that it's nothing more than 100% tobacco. But the point of the list is to have a complete list of what is lawful for sale. We understand the point of the list, but why do you need all the burdensome stuff if they just certify that they meet the federal definition? So the list is not burdensome. It is a one-page online... But why do you need all that stuff then? We need it for enforcement and retail and consumers to be able to know what is lawful for sale or not in the state. You said it's a one-page application. He says they have to put samples, they have to put labels, they have to put this, they have to put that, and it's not like they have to do it once. They have a whole bunch of different... And they have to submit samples. They do. There is a sample requirement because we have to confirm that the product is in fact unflavored. Okay, so it's not really just a one-page then? It is a series of questions to confirm the product is unflavored for the purposes of plaintiffs who have... And then you don't believe them. You make them still have it tested. We don't actually test the product. Why do they have to submit? So that we can confirm what the product looks like. If you don't test it, then... There is the option to test if there was an additional question. For plaintiffs, because their payment cigars are certified that they meet the federal standard, the comprehensive view of how their application would go is that they would provide us details, all the details of their brand style. So if I have a single cigar, like this is a single cigar, we'd have to know the length, the size, a couple other things, colors, what the packaging looked like at the retail level. So if an enforcement official goes into a tobacco shop, they could say, okay, this is the same barcode, this one's okay, this one isn't. So that information is there. And then they would check off the list of whether they have FDA authorization. And for plaintiffs, they're exempt from filing the federal pre-market review application because they are unflavored tobacco products. Now, I will note that right now the federal definition has unflavored tobacco. Unflavored tobacco is one of the prerequisites to be considered a premium cigar. But that definition is not set in stone. It's subject to litigation. We understand that there are some briefs in the D.C. Circuit where there is a desire to remove the unflavor requirement to that definition. So right now the process would be relatively simple for plaintiffs. But the state of California is very clear that the product that is going to be sold in California needs to be unflavored, and we require the manufacturers and importers of folks that bring in the products to the state. If the feds say it's unflavored, if that's what their requirement is, why can California say, well, I don't trust you, and your idea of unflavored isn't the same as my idea of unflavored, and so is there – we seem to say that it's so automatic, but I'm hearing that there's a chance that what the feds say, well, you'll say it's still flavored. For plaintiffs' cigars, that's very unlikely because they're saying – Well, very unlikely, but you want to retain that – but you want to retain the ability to decide it's unflavored, even though the feds have already said it is. If there were something in the application that required an additional closer look, like let's say they're certifying that it is a – it meets the federal definition of premium cigars, but there's some language in there that talks about blueberry or something. It allows the attorney general to just take a closer look and confirm, but I will say the manufacturers and importers, when they're bringing in their product for submission on the UTL, they're also certifying that the product is unflavored. Now, we could get into whether someone lies or not, but in general, they are confirming, and that's why it's – we're putting the onus on the manufacturers and importers. So it seems like you are – California's just setting up another premarket review. It is not a premarket review. A premarket review under the FDA has very specific requirements, and that's going to be in 21 U.S.C. 387J. It's a whole list of things they have to do, including scientific review. They do a marketing analysis to see if it attracts youth. Well, if California was setting up another premarket review, is that a problem for you? Would that be a problem to prevail in this case? Right, and we say that this is not a premarket review. This is an administration of our salesman. It is a list of what's lawful. So you can't really say, hey, all these products are not lawful. But you're asking for samples to do testing and then verification. That sounds very much like premarket review. All the verification is on the front end. The samples are – Premarket, right? Well, I think we're using the term premarket as it before comes into market, but premarket review is a term of art that is used in the FDA for their specific process, and the purpose of that process is to confirm the product is safe and lawful for sale across the United States. Isn't that what you're doing? No, we're just confirming that the product is unflavored. Well, it's because California presumes that unflavored products is unsafe for children, right? I think it's a little bit more than just that. I mean, flavored products historically have been used as a gateway for folks to be able to smell. Yeah, so it's a safety review. Yeah, and that's where we get into the government interest. So we're interested in regulating flavored products. We do it through this unflavored tobacco list. It's a single list. It makes it – anyone can now go online and see the products. No, go ahead. If I could just do this. I wanted to go on the free speech area. So, I mean, it is true that we weren't able to find it anywhere in paper, that once they check that they're a premium cigar under the federal definition, that they're automatically on the list, and the presumption of flavored is off the table, right? That's not in any regulation? No, the presumption is there during the UTL application process. So the AG can go in, and if there's some language in there that is questionable. Well, you give them a rebuttable presumption. Exactly. Is what you give them. But that's not the same as basically he was asking you, does it say anywhere once you've passed the federal certification? Is it a straight line to go? And it's not. It's not. I would say no just because you still have to pay the administration fee, right? So it's $300 per product. So assuming everything else is there, then you are eligible to be on the list. Unrebuttably, and your speech is irrelevant. Even if you say that this is the best coffee-flavored cigar. For the purposes of plaintiffs, which are the facts of this specific case, that's true. But that's not in any regulation or anything? It's not. It's how it's been applied. That's what's making them nervous. It sounds like it. And I would say this. And maybe understandably because you're kind of going, there's a little fudging here going on. The state law requires the AEG to presume that the rebuttable presumption works in that. During the application process, if there's an additional language there, it requires the AEG to take another look. And so when plaintiffs come in and submit their applications, they will check off the list that they are exempt from FDA review. And the act of submitting that information to us and certifying that that's true and correct, the presumption doesn't come into play. So looking at it another way, if the presumption ‑‑ Has it ever been ‑‑ it's been around for a couple of years. Has that ever been taken back? Well, the UTL has only been in effect about four months. Oh, is it? But the flavor ban has been in effect for several years. But to date, many of plaintiff's cigars, and I believe any of the folks who have qualified for premium cigars have all been eligible and made it on the list. So you would have no problem as if we were to rule on the First Amendment ground based only off of your representation that once they certify that they're a federal premium cigar, that any speeches ‑‑ the presumption is already rebutted indefinitely, and that, therefore, would not be First Amendment. But any other regime could have different implications. So long as they're meeting all the other requirements of the list, and, obviously, if there's a change in the federal definition of premium cigar, that would be a different question, right? But, essentially, that would be okay. But I would say this. Well, I'm not sure you're really saying that. I mean, because it seems like you still want to have the full ability to check and make them rebut the presumption. Well, the presumption wouldn't apply if they are just checking the box and saying that they are premium cigars and, by definition, are on flavored 100% tobacco. What would lead the state to reject an application? Well, a couple of reasons. One, if they were denied FDA authorization, that means they're ‑‑ No, I'm assuming that they submitted an application. They said we're certified by the feds. So what more would the state ‑‑ what would lead the state to reject an application? For premium cigars or generally? Premium cigars. We only hear about premium cigars. If premium cigars are, in fact, meeting that federal definition 100%, there's no reason why they wouldn't be eligible to be on the list. No, you just said eligible. But my question was what would lead you to reject it? There wouldn't be any reason to reject it. Then why do you need to check it? Because we have a complete list of what is lawful for sale. So if they want to sell in California, they need to be on the list. But I don't understand. What is it you're checking for beyond the certification? We are confirming that they meet all of the requirements. You're making sure that the federal government did it correctly? No, we're making sure that they're providing all the complete information so that anyone can go into a retail store. So what piece of information they may not have provided, they omitted, would lead you to reject the application? It sounds like what you're saying is that every application gets approved. If everything's complete. Well, now I'm trying to figure out what is it that would lead the state to reject an application. I'm sorry? Every application gets approved, but it's still. Not every application. So I want to say the complete things. We still need to know what is the individual product. And my friend on the other side has described that they have thousands of products, various size or whatnot. We want to know every individual product that is going to be eligible for sale in California because it's very difficult to compare cigars or different tobacco products and know, okay, this one's okay, but this one is not. Because there are other types of products that wouldn't be eligible on the list. So on the one hand, you say, well, all they have to do is certify and they're going to get on the list. On the other hand, you say, well, we want to check to make sure the application is complete. And I want to know what it is you're looking for that would lead you to reject the application. The application would be rejected. Assuming they provide all the detail that they're supposed to provide and they pay the fees. It would be rejected if, in fact, it is a flavored product. So in order for that to be true. How would you determine that? You just sniff it? That's one way. So the California definition to look at a flavored product is whether the reasonable consumer gets a taste or sensation of a non-tobacco constituent. So if you smell it, taste it, get the sensation that it is chocolate or other things. Now, it provides an exemption for the natural curing process of tobacco leaf. So that would be the situation here for plaintiffs. But it's going to be the two-prong. And then the second prong is whether there is a flavor constituent that is added in addition to the reasonable consumer. And that's where we get into other ingredients that could be added into the product that can make it seem to the reasonable person that there is some flavor. But then it seems like you're second-guessing what the feds did. So if the feds said no taste, no nothing there, then you say, well, you should have no problems. But you're still concerned that there still could be a problem. The federal government is not looking. The exemption that they have is that they don't have to submit anything to the FDA. So there is no check by the federal government as it relates to premium cigars. They're completely exempt. Right. That's why it feels like you're adding a requirement to the premarket review. But it's regulating something that's for the sale. So the tobacco sale component is still something that's- Are they different than everyone else? All the other people-do any of the other people have the federal approval? Well, they're not approved by the federal government. They're exempt. I don't believe that- So the other people, you're doing the initial review, except for these premier cigars. It's the same application for every tobacco product that is unflavored that wants to sell in California. And I will note that California does have a premium cigar exception. It has to be unflavored. All the same principles that are in the federal definition. But it also has to be $12 wholesale. So there is a group of folks that don't have to apply to the UTL. That and loose leaf tobacco and shisha, which is what they use in hookah. So there are some exemptions that are built in. It's just the premium cigar definition in California has that $12 threshold. And wholesale, which in retail means like-and I'm sure that my friend on the other side can tell me exactly what that is. But it's more in the $20-some range, which makes it a very expensive product. But that's not the case here. There's premium cigars that are asking for an exception when everyone else has to apply to be on the UTL to sell lost products. So you rely on the fact that it's a sale. But, I mean, your friend said it is true that if you had a laboring requirement to sell in California, that would violate the preemption clause. Wouldn't you agree? Yes. So what is the line then we should draw? Sometimes a sale could violate the preemption clause, correct? What's the line you think that we should draw? We should look at what is being regulated, not who is answering the question. Much was said that, oh, this is premarket because it's requiring manufacturers and importers to do something. Well, we're asking them to tell us and confirm that the product is unflavored. They're in the best position. They're at the top of the whole sales scheme here. It goes then to distributors and retailers and customers. So they can tell us because they're making the product, they're importing the product, whether it's flavored or not. And then they could just be eligible on the list. Then they can say whatever they want about their products, really. How much does it cost them on each cigar to do this? The initial application fee per brand style, meaning each individual product that is available for the customer or consumer, is $300. Is what? $300. $300? Yes. And the regulations allow up to $1,000, I believe, for the AG to assess based on the cost of administrating the list. But we're at $300. It's $150 per product to reapply every year. I was just going to ask you, how long is the application good for? It's good for a year. Now, we do also have a – that's just the overall application. If a product has packs of multiples, for example, or – actually, packs of multiples might be confusing. But let's say there's a holiday edition of the exact same product. We consider that a variant, so you wouldn't have to pay $300 again. It would be $150 for that additional thing. Do you have to do samples every year? Get one half off. You have to just do a sample of the general product. Once. Once, and that's it for the life of the product being on the UTL. And we look for an individual, what the product is in the retail level, so we're looking at a single cigar. But you have to do it every year? Not the sampling, just the recertification. And the recertification is $300 every year? $150.  Yes. Yeah, and that is based on the cost of administrating the list. Where's the list located? utl.ca.gov, I believe. It's on the Attorney General's website, and part of the law directs the Attorney General to administer the list. Okay. All right, it looks like I have 25 seconds, so wrap it up. Yeah, I will conclude with stating that the controlling authority in R.J. Reynolds confirms that the states have been the primary regulators of tobacco sales, and the TCA clearly preserves that authority. The UTL is consistent with that framework and is properly focused on regulating the consumer market and prohibiting retail sales of flavored products. And with that, we ask the court to affirm the district court's judgment and deny plaintiff's request for an injunction. Thank you. Thank you. Thank you, Your Honors. The state should have exempted federally defined premium cigars from the review. There's no point for this process for federally defined premium cigars. They are not flavored, but they didn't do that. They decided to make premium cigars submit the same application as the dangerous vaping products, as cigarette manufacturers, and it's not just a fee. It's the burden of putting the applications together. It's not just a piece of paper. It is all the marketing materials for every product, a picture of every side of every package in which the product is sold, a sample in the largest box available. So most of these things come in boxes of 20 cigars. They're going to need one of those. It's very expensive to put this together. It costs thousands of dollars per variety, and it is costing the industry tens, if not hundreds of millions of dollars, and that's undisputed in the record. So after the law passed, is there sort of a regulatory process that took place here in California? Yes. After the law passed, there was a regulation that came out. They waited a year to put the regulation out, just three months before this law took effect, just six weeks before you had to submit the applications. Instead of going down the route of letting federally defined premium cigars out of this process, they subjected them to the full burdens and chose to require all the information. Did the industry challenge the regulations in state court? Yes, Your Honor. Arbitrary and capricious or inconsistent with the statute? Yes, Your Honor, and that challenge is pending right now. Where is it now? It's both at Los Angeles County Superior Court and up at the Court of Appeal. Is it in the Court of Appeal for a decision? Yes. In the Ninth Circuit? No, the State Court of Appeal. Oh, the State Court of Appeal. They deny it. The trial court denied a preliminary injunction, and that has been appealed.  And it's coming up. So it's in the—that would be what the first—the second DCA. It's in the second DCA. Yes, Your Honor. So— That's a challenge to the regulation itself. That's right. And I will say, they talk about federal cigars going through a box checking exercise. The federal definition of premium cigars is not mentioned once in those regulations, not mentioned once in the law, right? So this is all kind of post hoc litigation arguments. And if they want to exempt premium cigars through this process, they certainly should if we wouldn't be here right now. Let me go to preemption for just a moment. Wait. Your Honor— I've already been— I know. You have been indulgent.  Give an inch, take a mile. That's right, Your Honor. So go for it. 30 seconds. Your Honor, those words under the provisions of this chapter, that applies to every term in the preemption clause.  And if you play that all the way through, it can't just be about the federal process. But beyond that, RJR said you have to interpret the savings clause and the preemption clause to give meaning to both, right? Right. Our interpretation gives lots of room for the sales clause. You can do what states have done across the country and ban retail sales of finished products. All we're saying here is you cannot use the mechanism of pulling the manufacturers in, just like the federal government does, and have them provide an application to put their product on the market first. Their interpretation that says it's only about the federal process and states injecting themselves into it, those are angels dancing on the head of a pen. They can't point to a single example of a state doing that, and there's no point to doing it. It would probably be unconstitutional commandeering of the federal government. It's not what the preemption clause was about, and it doesn't reconcile how the other terms in the preemption clause work. With that, Your Honor, I urge the court to hold that the law is preempted and violates the First Amendment. Thank you, Your Honor. Thank you both for your argument in this matter. This case will stand submitted and we're in recess until tomorrow at 9 a.m. All rise.
judges: PAEZ, CALLAHAN, BUMATAY